UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BERNARD CHAUNCEY MURPHY,

       Petitioner,

vs.

GREGORY McQUIGGIN,

       Respondent.

_____/

Civil Action No. 10-CV-10494

HON. BERNARD A. FRIEDMAN

## OPINION AND ORDER
## DENYING PETITIONER'S APPLICATION FOR A WRIT OF HABEAS CORPUS,
## DENYING A CERTIFICATE OF APPEALABILITY, AND
## DENYING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL

This matter is presently before the Court petitioner Bernard Chauncey Murphy's *pro se* application for a writ of habeas corpus. Petitioner is serving a sentence of 15 to 30 years in prison for two counts of armed robbery, *see* Mich. Comp. Laws § 750.529, and a consecutive two-year term for possessing a firearm during the commission of a felony, *see* Mich. Comp. Laws § 750.227b. Petitioner challenges an eyewitness' pretrial identification of him, his trial and appellate attorneys' performance, the prosecutor's closing argument, and the state trial court's evidentiary ruling about a shotgun. Respondent Gregory McQuiggin urges the Court to dismiss the petition. Having reviewed the pleadings and record, the Court concludes that petitioner's claims do not warrant habeas relief. Accordingly, the petition will be denied.

## I. Background

### A. The Pretrial Proceedings and Trial

Before trial, the prosecutor moved for permission to admit evidence of a shotgun and shotgun shells that were found at a gas station and in a pickup truck after an unrelated carjacking on the day after the robbery in question. Wayne County Circuit Judge Deborah A. Thomas excluded

evidence of the gun, but allowed evidence of the shotgun shells.  The prosecutor immediately filed

an interlocutory appeal from the trial court's ruling, and, on April 23, 2004, the Michigan Court of

Appeals reversed, concluding that the trial court abused its discretion in excluding evidence of the

shotgun.  *See People v. Murphy,* No. 255101 (Mich. Ct. App. Apr. 23, 2004).  On remand, the trial

court stayed the case so that petitioner's attorney could seek reconsideration in the Court of Appeals

or apply for leave to appeal in the Michigan Supreme Court.  Defense counsel did not seek

reconsideration in the Court of Appeals, and petitioner's appellate attorney did not appeal to the state

supreme court.  As a result, the case proceeded to trial in Wayne County Circuit Court before Judge

Michael M. Hathaway.  The evidence at trial established that,

> [b]etween 5:30 and 6:15 a.m. on November 27, 2003,
> Christopher Holman and his fiancée, Tammy Isaac, were traveling in
> Isaac's car to see the Thanksgiving Day parade.  While they were
> stopped at a traffic light in Detroit, a black Dodge Ram pickup truck
> struck them from behind.  Holman got out of the vehicle and
> discovered there was no damage.  A man, whom Holman identified
> as defendant, got out of the passenger seat of the pickup truck
> holding a shotgun and yelled, "get down on the ground now."
> Holman got down on the ground, and defendant told Holman to give
> all his money to the driver of the pickup truck.  Holman removed all
> the money from his wallet, $175, and gave it to the driver.
>
> Meanwhile, defendant tapped on the passenger window with
> the gun and twice ordered Isaac to get out of the car.  Isaac got out of
> the car and defendant grabbed her and threw her on the ground.
> Defendant pointed the gun at Isaac, threatened to kill her, and
> demanded all of her money.  Defendant searched the car and removed
> two cell phones and Isaac's purse.  Isaac's purse contained about $23,
> spare keys to Holman's vehicle, and Isaac's driver license, social
> security card, credit cards, and bankcard.  Defendant inquired about
> whether Holman had given the driver his money.  After Holman
> demonstrated that his wallet was empty, defendant and the driver
> returned to the pickup truck and drove away.  Holman and Isaac
> drove to the state police department in Taylor where they reported the
> incident.

On November 28, 2003, Sergeant Ramon Childs received an unrelated carjacking complaint involving a sawed-off shotgun and a black pickup truck. Near the area where the complaint originated, Childs encountered a black Dodge pickup truck and followed it to a gas station. The pickup truck parked adjacent to a gas pump and four men got out. Childs saw two men go into the store, one walk to the side or rear of the station, and one stand near the pickup truck. After Childs saw the men get back into the pickup truck and drive away from the station, he called for backup. More police officers arrived and they stopped the pickup truck on a nearby street. Defendant was the driver of the pickup truck. Childs found live shotgun shells in the pickup truck, and the police searched the gas station, where they found more live shotgun shells in the garbage next to the gas pump where the black pickup had been parked. They also found a sawed-off shotgun in the rear of the gas station. The black pickup truck was registered to Melvin J. Murphy, Sr., who shared an address with defendant.

*People v. Murphy*, No. 258397, 2006 WL 2924751, at *1 (Mich. Ct. App. Oct. 12, 2006).

Neither Mr. Holman, nor Ms. Isaac, was able to identify petitioner in a photographic array shown to them on December 6, 2003, but on December 10, 2003, Holman identified petitioner as the passenger in the black pickup truck on Thanksgiving and the man with the gun. Ms. Isaac identified someone named Delano Howard in the lineup, and in a different line-up conducted on December 11, 2003, both Holman and Isaac apparently identified Charles Jones as the driver of the pickup truck.

Petitioner did not testify at trial or present any witnesses, and on September 20, 2004, the jury found him guilty, as charged, of two counts of armed robbery and one count of felony firearm. On October 4, 2004, the trial court sentenced petitioner to concurrent terms of 15 to 30 years for the armed robbery convictions and a consecutive term of two years in prison for the felony firearm conviction.

**B. The Direct Appeal, Remand, and Subsequent Appeal to the Michigan Supreme Court**

3

Petitioner appealed his convictions on grounds that (1) his attorneys were ineffective for failing to oppose the prosecutor's interlocutory appeal and subsequently failing either to seek reconsideration in the Michigan Court of Appeals or to apply for leave to appeal in the Michigan Supreme Court; and (2) the trial court abused its discretion when it ruled that Mr. Holman's identification testimony was admissible.  The Michigan Court of Appeals reversed petitioner's convictions and remanded the case for a new trial on the basis that petitioner was denied the effective assistance of counsel during the interlocutory appeal of the trial court's order suppressing evidence of the shotgun allegedly used during the robbery.  The Court of Appeals determined that the identification issue was moot.  *See People v. Murphy*, No 258397 (Mich. Ct. App. Oct. 12, 2006).              On June 25, 2008, the Michigan Supreme Court reversed the lower court's order and remanded the case for a new appeal rather than a new trial.  *See People v. Murphy*, 481 Mich. 919 (2008).  On remand, the Michigan Court of Appeals affirmed petitioner's convictions, *see People v. Murphy*, 282 Mich. App. 571 (2009), and on August 6, 2009, the Michigan Supreme Court denied petitioner's *pro se* application for leave to appeal.  *See People v. Murphy*, 484 Mich. 869 (2009).

**C.  The Habeas Petition, State Collateral Appeal, and Supplemental Habeas Petition**

On February 4, 2010, petitioner filed his habeas petition, which raises two claims: (1) the state trial court did not abuse its discretion when it refused the prosecution's request to admit testimony about how the police found a sawed-off shotgun behind a gas station; and (2) there was no reason for the state trial court to admit Mr. Holman's identification of petitioner.  After respondent filed an answer to the petition, petitioner asked the court to hold his petition in abeyance while he exhausted state remedies for several new claims.  On November 30, 2010, the judge

4

initially assigned to this case granted petitioner's request and ordered him to file a motion for relief from judgment in the state trial court within 90 days of the court's order.   In the same order, the court closed this case for administrative purposes.

Petitioner then filed a motion for relief from judgment in the state trial court.[1]   He alleged that (1) his trial attorney was ineffective for failing to call Charles Jones and Melvin Murphy as witnesses; (2) the prosecutor made improper closing arguments; (3) the pretrial identification procedure was unduly suggestive; (4) his sentence was invalid; (5) appellate counsel was ineffective; and (6) the cumulative effect of errors required relief from judgment.   The trial court denied petitioner's motion in a reasoned opinion, and the Michigan Court of Appeals denied leave to appeal. *See People v. Murphy*, No. 305255 (Mich. Ct. App. May 2, 2012).   On October 22, 2012, the Michigan Supreme Court likewise denied leave to appeal. *See People v. Murphy*, 493 Mich. 869 (2012).

On December 6, 2012, petitioner asked the court to re-open his habeas corpus case and to adjudicate his newly exhausted claims, as well as the claims that he presented in his initial petition. On April 15, 2013, the Court granted petitioner's motion, and on June 10, 2013, respondent filed a supplemental answer to the habeas petition.

Respondent urges the court to dismiss the petition because petitioner failed to comply with the Court's November 30, 2010, order to file his motion for relief from judgment in state court by February 28, 2011.   Petitioner dated his motion on February 27, 2011, and he has submitted a document purporting to show that a prison official placed the motion in the outgoing mail on February 28, 2011.   Although the motion was not filed in the state trial court until March 15, 2011,

---

[1]   The motion is dated February 27, 2011, but it was stamped "filed" on March 15, 2011.

5

the delay in filing the motion was short.  The Court therefore chooses to excuse the failure to comply strictly with its previous order.

## II.  Standard of Review

"The statutory authority of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)."  *Harrington v. Richter*, 562 U.S. 86, 97 (2011).  Pursuant to § 2254, the Court may not grant a state prisoner's application for the writ of habeas corpus unless the state court's adjudication of the prisoner's claims on the merits

> (1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

> Under the "contrary to" clause [of § 2254(d)(1)], a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause [of § 2254(d)(1)], a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Williams v. Taylor*, 529 U.S. 362, 412-13 (2000).

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id*. at 411.

6

"AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' *Lindh v. Murphy*, 521 U.S. 320, 333 n.7 (1997), and 'demands that state-court decisions be given the benefit of the doubt,' *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (*per curiam*)." *Renico v. Lett*, 559 U.S. 766, 773 (2010).

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Accordingly,

> [w]hen reviewing state criminal convictions on collateral review, federal judges are required to afford state courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong. Federal habeas review thus exists as "a guard against extreme malfunctions in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Harrington*, *supra*, at 102–103, 131 S. Ct. 770 (internal quotation marks omitted). This is especially true for claims of ineffective assistance of counsel, where AEDPA review must be " ' "doubly deferential" ' " in order to afford "both the state court and the defense attorney the benefit of the doubt." *Burt v. Titlow*, 571 U.S. ——, ——, 134 S.Ct. 10, 13, 187 L.Ed.2d 348 (2013) (quoting *Cullen v. Pinholster*, 563 U.S. 170, ——, 131 S.Ct. 1388, 1403, 179 L.Ed.2d 557 (2011)).

*Woods v. Donald*, 135 S.Ct. 1372, 1376 (2015) (*per curiam*). To obtain a writ of habeas corpus from a federal court, a state prisoner must show that the state court's ruling on his claims "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103.

## III. Analysis

### A. The Shotgun Evidence
(Claim I of the initial petition)

### 1. Background Information

Petitioner alleges that Wayne County Circuit Judge Deborah A. Thomas did not abuse her discretion when she refused the prosecution's request to admit testimony about the sawed-off shotgun which the police found behind a gas station on the day after the robbery of Mr. Holman and Ms. Isaac. The gun was found after an unrelated carjacking, but the prosecutor used it to bolster his case against petitioner in the armed robbery case.[2] Sergeant Ramon Childs of the Detroit Police Department was permitted to testify that, while he was on patrol the day after Thanksgiving in 2003, he heard about a carjacking that occurred approximately five or six blocks from where he was located. He drove to the area where the carjacking supposedly occurred and noticed a black pickup truck that matched the description of the vehicle given by the victim of the carjacking. He followed the pickup truck to a gas station where all four occupants got out of the truck. One of the men stayed at the gas pump, two of the men went inside the store, and one man walked to the side or back of the gas station. Subsequently, all four men got back in the truck and drove away. He called for assistance and the officers who responded to his call stopped the truck. The police

---

[2] The carjacking incident occurred about 23 hours after the robbery of Holman and Isaac. In that case,

> [t]he victim was delivering newspapers in Detroit at approximately 4:30 [a.m.] when a black pickup truck approached, someone from the truck pointed a sawed-off long gun at him and demanded that he not look in that direction, and told him to lie face down on the ground. Multiple assailants then threatened to shoot him, demanded money, searched him, and took his glasses and keys. The victim saw both the truck and his own car driving away. He called the police with his description of the truck and firearm, but he could not identify any of the assailants.

*Murphy*, 282 Mich. App. at 575 (quoting *People v. Jones*, Nos. 254939 and 254964, 2005 WL 3018637 (Mich. Ct. App. Nov. 10, 2005)).

arrested all four men, including petitioner who had been driving the truck.

Sergeant Childs testified that no weapon was found in the truck, but he observed shotgun shells in the vehicle.  Later, he and some other officers went back to the gas station where he first saw the truck and then conducted a search.  A couple of live shotgun shells were found in the trash receptacle by the gas pump where the truck had parked, and a sawed-off shotgun was found at the rear of the gas station.  According to Sergeant Childs, the owner of the pickup truck was Melvin J. Murphy, Sr., who had the same address as petitioner, and the carjacking victim alleged that he was assaulted with a sawed-off shotgun similar to the one in evidence at petitioner's armed robbery trial.  (Trial Tr. Vol. 2, 65-88, 106, Sept. 16, 2004.)

Officer Gary Pavicic testified at petitioner's trial that he assisted Sergeant Childs in the carjacking case.  He found a shotgun and a magazine or clip with three live rounds in a dumpster behind the gas station.  (*Id*. at 112-18.)  Officer Barron Townsend also participated in the search at the gas station, and he found two shotgun shells in the garbage can near the gas pump.  (*Id*. at 122.) Officer John Baritche testified that he found three live shotgun shells on the driver's seat of the pickup truck.  (*Id*. at 129.)

### 2.  Analysis

Petitioner maintains that the jury should not have heard testimony about the gun because the testimony showed mere proximity to the gun, not knowing possession and control of it, and because the gun was not directly connected to him or to the robbery of Holman and Isaac. The Michigan Court of Appeals adjudicated this claim on the merits during the direct appeal and concluded that "Judge Thomas abused her discretion by ruling that in the absence of direct evidence linking defendant and the shotgun, the prosecutor could not introduce the shotgun at defendant's

trial." *Murphy*, 282 Mich. App. at 482.

Generally, "alleged errors in evidentiary rulings by state courts are not cognizable in federal habeas review." *Moreland v. Bradshaw*, 699 F.3d 908, 923 (6th Cir. 2012). Petitioner nevertheless claims that it was fundamentally unfair to admit evidence of the gun because the gun was not directly connected to him or to the armed robbery and because the evidence could have confused the issues and misled the jury.

While a federal court may grant relief in cases where the state court's evidentiary ruling was so fundamentally unfair as to constitute a due-process violation, *id.*, the Supreme Court has "defined the category of infractions that violate 'fundamental fairness' very narrowly." *Dowling v. U.S.*, 493 U.S. 342, 352 (1990). Further, the Michigan Court of Appeals determined that "the appropriate test [was] not whether sufficient evidence existed to convict [petitioner] of constructively possessing the shotgun, but whether the circumstances surrounding the gun's discovery tended to establish [petitioner's] connection to it." *Murphy*, 282 Mich. App. at 580. The Michigan Court of Appeals noted that the main issue at trial was whether Mr. Holman had correctly identified petitioner as one of the men who robbed him and Ms. Isaac on Thanksgiving. Evidence that, on the day after Thanksgiving, petitioner was linked to a truck and gun similar to the truck and gun used in the robbery on Thanksgiving "tended to prove defendant's identity as one of the assailants who had robbed Holman and Isaac on Thanksgiving Day." *Id.* In other words, "[a]lthough circumstantial, this evidence had a tendency to corroborate [petitioner's] identity as a participant in the armed robbery . . . ." *Id.* at 581-82.

Petitioner argues that, even if the evidence were relevant and admissible as such under Michigan Rules of Evidence 401 and 402, it should have been excluded under Rule 403,

10

because its "probative value [was] substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury . . . ." Mich. R. Evid. 403. The Michigan Court of Appeals, however, opined that, although the carjacking evidence involved an entirely separate crime, the risk of unfair prejudice did not substantially outweigh the probative force of the evidence, because the evidence connected petitioner to the pickup truck and the shotgun. The Court of Appeals also noted that the prosecutor did not argue to the jury that petitioner must be guilty of armed robbery because he participated in a subsequent carjacking. Moreover, Judge Hathaway cautioned the jury not to use evidence of another crime to conclude that petitioner was a bad person or likely to commit crimes and not to convict petitioner because they thought he was guilty of other bad conduct. (Trial Tr. Vol. IV, 60, Sept. 20, 2004.) This instruction "limit[ed] the potential for undue prejudice." *Murphy*, 282 Mich. App. at 583.

The Court concludes for the reasons given by the state appellate court that the prosecutor's use of evidence regarding the sawed-off shotgun was not fundamentally unfair. Petitioner therefore has no right to habeas relief on the basis of his evidentiary claim.

### B. The Identification
(Claim II of the initial petition and Claim III of the supplemental petition)

Petitioner argues next that the state trial court committed reversible error by admitting testimony regarding Mr. Holman's identification of him. Holman explained at trial that he attended a live lineup consisting of six men on December 10, 2003. He looked at the men and then asked the officer in charge to have each man say, "Get down on the ground now," because the gunman gave that order two times during the robbery. After each man in the lineup spoke those words, Holman identified petitioner as one of the robbers. (Trial Tr. Vol. I, 234-37, 248, Sept. 15, 2004.)

Petitioner argues that the pretrial identification procedure was unduly suggestive

11

because (1) the police combined a visual identification procedure with a voice identification procedure and (2) Holman never testified that there was anything distinctive about the gunman's voice and there was no evidence that Holman was familiar with petitioner's voice. According to petitioner, Holman would not have been able to identify him had he not spoken during the lineup. The Michigan Court of Appeals adjudicated petitioner's claim on the merits during the direct appeal and concluded that the identification was reliable.

### 1.  Clearly Established Federal Law

To prevail on his claim that Holman's identification derived from a suggestive pretrial identification procedure, petitioner must show that the procedure was "'so unnecessarily suggestive and conductive to irreparable mistaken identification that he was denied due process of law.'" *Neil v. Biggers*, 409 U.S. 188, 196 (1972) (quoting *Stovall v. Denno*, 388 U.S. 293, 301-02 (1967)). "[U]nless there is 'a very substantial likelihood of irreparable misidentification,' identification evidence 'is for the jury to weigh.'" *Peterson v. Smith*, 510 F. App'x 356, 363 (6th Cir. 2013) (quoting *Manson v. Brathwaite*, 432 U.S. 98, 116 (1977)). If the identification was suggestive, the question becomes "whether under the 'totality of the circumstances,' the identification was reliable even though the confrontation procedure was suggestive." *Biggers*, 409 U.S. at 199.

### 2.  The Pretrial Identification Procedure

There were six men, including petitioner, in the pretrial line-up. According to the attorney who was present to ensure the fairness of the line-up, all of the men wore knit hats at his suggestion so that their various hair styles were not visible. Other than the hair styles, the attorney had no objection to the physical characteristics of the men in the lineup. (Trial Tr. Vol. IV, 9-10,

Sept. 20, 2004.)  His only objection was that three of the six men were suspects from a single incident.  But the basis for petitioner's claim is that the lineup combined a visual identification with a voice identification and there was nothing distinctive or familiar about his voice to make the voice identification reliable.

The Michigan Court of Appeals stated on review of petitioner's claim that, under state law, vocal identification evidence is admissible if the identifying witness' testimony is certain and unequivocal.  *Murphy*, 282 Mich. App. at 584.  The Court of Appeals also stated that "voice identification must be based on a peculiarity in the voice or on sufficient previous knowledge by the witness of the person[']s voice."  *Id.*  The Court of Appeals concluded from the totality of the circumstances, including Mr. Holman's opportunity to hear and see the gunman and the certainty of his identification, that the voice identification was sufficiently reliable.

Petitioner has not cited any Supreme Court case that prohibits voice identification during a lineup.  In fact, the victim in *Biggers* attended a show-up where the defendant was directed to say, "Shut up or I'll kill you."  It was unclear from the testimony at trial whether the victim identified the defendant before or after he spoke those words, but the Supreme Court's concern seemed to be with the fact that the defendant was the only person in the show-up, not the fact that the defendant was asked to speak during a visual show-up.  Consequently, there is no Supreme Court precedent that the state court's decision in this case could be contrary to, or an unreasonable application of, under § 2254(d)(1).  And because the lineup attorney "made no objection to or comments about any discrepancy in the voices . . . , there was nothing to suggest that the lineup procedure was in any way improper . . . ."  *Millender v. Adams*, 376 F.3d 520, 525 (6th Cir. 2004). The Court concludes that the identification procedure was not unduly suggestive.

### 3. Independent Basis

Even if the Court were to find that the pretrial identification was unnecessarily suggestive, the record indicates that Holman's in-court identification of petitioner was reliable. "[T]he factors to be considered in evaluating the likelihood of misidentification include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Biggers*, 409 U.S. at 199-200.

Holman testified that, when the gunman first exited the pickup truck, he was 15 to 20 feet away from him and there was nothing blocking his view of the gunman's upper body, including his face. Later during the incident, the gunman stood between five and nine feet from him and there was nothing blocking his view of the gunman. There was lighting from the street lights and the pickup truck, which was directly behind his car, and he had no trouble seeing when he checked for damage to his car. (Trial Tr. Vol. I, 205-07, 214-15, 220, 223, Sept. 15, 2004.)

Holman also stated that it was a stressful situation for him. (*Id*. at 254.) His attention no doubt was heightened due to the stress of the incident and the fact that he was concerned about his and his girlfriend's safety. *See Howard v. Bouchard*, 405 F.3d 459, 473 (6th Cir. 2005) (noting that courts find a victim's identification more trustworthy than that of a uninterested bystander or casual observer of a crime because a victim views the assailant with a heightened degree of attention and has a reason to pay attention to the suspect).

Holman's pretrial description of the suspect was very general (black male in his twenties wearing a winter jacket with a hood) (Trial Tr. Vol. I, 246, Sept. 15, 2004), and petitioner

14

has not alleged that this description did not match him. Holman, moreover, was certain of his pretrial identification because the gunman's face was imbedded in his mind. (*Id*. at 212, 237-38, 250.) Petitioner's face and voice sounded familiar to him, and seeing petitioner in the lineup refreshed his memory. (*Id*. at 251.) Furthermore, the lineup occurred on December 10, 2003 (*id*. at 234-35), a mere 13 days after the robbery.

       To summarize, petitioner had a good opportunity to view the suspect, his degree of attention was heightened, his description of the suspect was accurate, he was certain of his identification at the lineup, and the length of time between the robbery and the lineup was short. The totality of the circumstances indicate that the identification was reliable even if the pretrial procedure was suggestive. And because the state appellate court's rejection of petitioner's claim was not contrary to, or an unreasonable application of, any Supreme Court decision, petitioner has no right to habeas relief on the basis of his challenge to Mr. Holman's identification of him.

### C. Trial Counsel
(Claim I of the supplemental petition)

       Petitioner claims that his trial attorney was ineffective for failing to call his co-defendant, Charles Jones, and his father, Melvin Murphy, as witnesses. According to petitioner, his father would have testified that petitioner was at home at the time of the crime, and Charles Jones would have testified that someone other than petitioner committed the crime with him.

       The state trial court was the last state court to address this claim in a reasoned opinion. It determined that "trial counsel was well within the bounds of sound professional judgment in deciding not to call defendant's two civilian witnesses." Op. & Order Denying Def.'s Mot. for Relief from J. (Wayne County Cir. Ct. May 19, 2011).

### 1. Clearly Established Federal Law

The Supreme Court's decision in *Strickland v. Washington,* 466 U.S. 668, 687 (1984), is clearly established federal law for purposes of ineffective assistance of counsel claims. *See Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011).  Under *Strickland*, a defendant must show that his trial attorney's "performance was deficient" and "that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687.  "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." *Id*.

The "deficient performance" prong of the *Strickland* test "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id*. at 687.  "Judicial scrutiny of counsel's performance must be highly deferential." *Id*. at 689.

> A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

*Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

To demonstrate that counsel's performance prejudiced the defense, petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.  "This does not require a showing that counsel's actions 'more likely than not altered the outcome,' " but "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 111-12 (quoting *Strickland*, 466 U.S.

16

at 693).

"The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Id*. at 105 (citations omitted). "When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id*.

### 2. Melvin Murphy

Petitioner claims that his attorney should have called his father, Melvin Murphy, as an alibi witness. According to petitioner, Mr. Murphy would have testified that petitioner was at home in bed when the robbery occurred.

"[T]he failure to call a known alibi witness generally would constitute ineffective assistance of counsel." *Bigelow v. Williams*, 367 F.3d 562, 570 (6th Cir. 2004). And in this case there is no explanation in the record as to why defense counsel did not call Mr. Murphy as an alibi witness. She included Mr. Murphy as a potential defense witness on the day initially set for trial, *see* Trial Tr., 9, Apr. 22, 2004, but when the case actually went to trial, defense counsel indicated that she had no witnesses. (Trial Tr. Vol. I, 18, Sept. 15, 2004.) She rested her case without producing any witnesses. (Trial Tr. Vol. IV, 20, Sept. 20, 2004.)

Mr. Murphy, however, was the owner of the truck allegedly used in the robbery, and petitioner has not submitted an affidavit or any other evidence demonstrating that his father was willing and able to testify as an alibi witness. An attorney is not ineffective for failing to call an alleged alibi witness where there is no affidavit from the witness or any evidence that the witness would have provided helpful testimony for the defense. *See Townsend v. Lafler*, 99 F. App'x 606,

17

610 (6th Cir. 2004) (concluding that the habeas petitioner was in no position to support his theory of actual innocence where he never produced an affidavit from the person who presumably would have provided information that someone else committed the crime); *Dows v. Wood*, 211 F.3d 480, 486-87 (9th Cir. 2000).

Further, "[c]onclusory allegations, without evidentiary support, do not provide a basis for habeas relief." *Prince v. Straub*, 78 F. App'x 440, 442 (6th Cir. 2003). Thus, petitioner's bare and self-serving allegations are insufficient support for the contention that Mr. Murphy would have provided an alibi for him. *See Parker v. Ercole*, 582 F. Supp. 2d 273, 295 (N.D.N.Y. 2008).

Petitioner has failed to overcome the presumption that defense counsel's decision not to call Mr. Murphy as an alibi witness might be considered sound trial strategy. *Strickland*, 466 U.S. at 689. Therefore, this is not a basis for concluding that defense court's performance was deficient or prejudicial.

### 3. Charles Jones

Petitioner next contends that defense counsel should have produced co-defendant Charles Jones as a witness because Jones would have testified that Delano Howard, not petitioner, committed the robbery with him. Before trial, Ms. Isaac identified Jones as the driver of the pickup truck involved in the robbery (Trial Tr. Vol. II, 46-47, Sept. 26, 2004), and she identified Mr. Howard as the gunman. *See* Mot. to Re-Open the Original Pet. for Habeas Corpus, Ex. B; *see also* Trial Tr. Vol. IV, 7, Sept. 20, 2004.

The record indicates that defense counsel initially named Jones as a potential witness. (Trial Tr., 9, Apr. 22, 2004.) But the prosecutor objected to having Jones testify because defense counsel failed to give timely notice that she intended to call him, and the trial court ruled that Jones

18

could not testify. (*Id*. at 125-26.) Petitioner claims that defense counsel was remiss for not pointing out that Jones was a co-defendant and not an alibi witness, inasmuch as he would have testified that someone other than petitioner committed the robbery with him.

Jones has submitted an affidavit stating that he committed the robbery with Delano Howard and that petitioner was not involved in the robbery. Jones also states in the affidavit that on April 21, 2004, he informed petitioner's trial attorney that petitioner was not involved in the robbery and that he (Jones) was willing to testify in petitioner's behalf. According to Jones' affidavit, he pleaded guilty to the armed robbery on May 11, 2004, but petitioner's attorney never called him to testify at petitioner's subsequent trial. *See* Mot. to Re-Open the Original Pet. for Habeas Corpus, Ex. A.

The record does not indicate why defense counsel failed to call Charles Jones as a defense witness. But Jones' affidavit is dated May 4, 2011, several years after petitioner's trial and conviction in 2004. "Calling a co-defendant as a witness is a risky tactic. If the person testifies at all, the testimony may do more to inculpate than to exculpate the accused." *Fletcher v. Briley,* 68 F. App'x 716, 718 (7th Cir. 2003). Petitioner's attorney may not have wanted to associate petitioner with Jones, who apparently pleaded guilty to the crime for which petitioner was on trial.

Additionally, petitioner concedes that Delano Howard was never charged in the robbery, and it appears that Howard may have been a mere filler in petitioner's lineup. If Jones had testified that Delano Howard committed the armed robbery with him, it is conceivable that the prosecution would have produced a police officer to explain why Howard was not charged with the robbery and was not a suspect in the case. Such testimony would have undermined Jones' testimony, made him appear deceptive, and harmed the defense.

19

Without proof to the contrary, the Court must assume that defense counsel adequately considered the possibility of calling Jones as a witness, but ultimately decided that the best strategy was not to call him. *See Davis v. Lafler*, 658 F.3d 525, 537-38 (6th Cir. 2011). Further, given the double deference accorded claims of ineffective assistance of counsel, the Court declines to grant relief on petitioner's claim that defense counsel was ineffective for failing to produce Charles Jones as a witness.

### D. The Prosecutor
(Claim II of the supplemental petition)

Petitioner contends that the prosecutor's remarks during closing arguments deprived him of his right to a fair trial. Petitioner alleges that the prosecutor vouched for the credibility of a witness and misrepresented the facts. The state trial court determined on review of petitioner's claim that the alleged misconduct was nothing more than permissible advocacy.

"Claims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004).

> [I]t "is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden v. Wainwright*, 699 F.2d [1031, 1036 (11th Cir. 1983)]. The relevant question is whether the prosecutors' comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Moreover, the appropriate standard of review for such a claim on writ of habeas corpus is "the narrow one of due process, and not the broad exercise of supervisory power." *Id*., at 642, 94 S.Ct., at 1871.

*Darden v. Wainwright*, 477 U.S. 168, 181 (1986). "To constitute a denial of due process, the misconduct must be 'so pronounced and persistent that it permeates the entire atmosphere of the trial.'" *Byrd v. Collins*, 209 F.3d 486, 529 (6th Cir. 2000) (quoting *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997)).

20

### 1. Vouching

Petitioner suggests that the prosecutor vouched for the police officers' investigation and testimony when he stated that the jurors could consider whether other evidence supported the identification of petitioner and that "Because [Investigator] Buyse does his job, you're in the captain's seat." (Trial Tr. Vol. IV, 30, Sept. 20, 2004.) Buyse was the detective who conducted the live lineup. Petitioner alleges that the prosecutor's comment about Investigator Buyse added weight to a weak prosecution case and allowed the jury to rely heavily on the investigator's testimony. Petitioner also claims that the remark left the impression that the jurors should convict petitioner because the investigator did a good job.

> "Improper vouching occurs when a prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility [,] thereby placing the prestige of the office of the [prosecutor] behind that witness." *United States v. Trujillo*, 376 F.3d 593, 607 (6th Cir. 2004) (internal quotation marks omitted). "Improper vouching involves either blunt comments or comments that imply that the prosecutor has special knowledge of facts not in front of the jury." *Id*. at 607–08 (internal alterations and quotation marks omitted).

*U.S. v. Garcia*, 758 F.3d 714, 723 (6th Cir.), *cert. denied*, 135 S. Ct. 498 (2014).

Here, the prosecutor merely indicated that Investigator Buyse did his job. The prosecutor did not suggest that he had special knowledge of the facts. Nor did he say that Buyse did a good job or that he personally found Buyse to be credible. While the prosecutor may have implied that Buyse did exemplary work on the case, the direct and circumstantial evidence against petitioner was substantial, and the trial court instructed the jurors that the attorneys' arguments were not evidence. (Trial Tr. Vol. I, 168, Sept. 15, 2004; Trial Tr. Vol. IV, 55-56, Sept. 20, 2004.) The prosecutor's comment about Buyse could not have had a "substantial and injurious effect or

21

influence" on the jury's verdict, *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)), and was harmless.

### 2.  Misrepresenting the Facts

Petitioner also contends that the prosecutor misrepresented the facts and misled the jury when he stated during closing arguments that the gun in evidence was the weapon used in the robbery.  (Trial Tr. Vol. IV, 26-27, Sept. 20, 2004.)  Prosecutors may not misrepresent the facts, "because doing so 'may profoundly impress a jury and may have a significant impact on the jury's deliberations.'"  *Washington v. Hofbauer*, 228 F.3d 689, 700 (6th Cir. 2000) (quoting *DeChristoforo*, 416 U.S. at 646).  Prosecutors may, however, "forcefully assert reasonable inferences from the evidence."  *U.S. v. Lawrence*, 735 F.3d 385, 435 (6th Cir. 2013), *cert. denied*, 135 S. Ct. 753 (2014).               Mr. Holman testified that the gun in evidence looked like the gun he saw during the robbery.  He was not able to say with certainty that the gun in evidence was the same one that petitioner used during the robbery.  (Trial Tr. Vol. I, 204-05, Sept. 15, 2004.)  But there was testimony linking petitioner to the gun in evidence, and it was reasonable to infer that the gun in evidence was the one used during the robbery of Mr. Holman and Ms. Isaac.  Therefore, the prosecutor's remark was not improper.

### 3.  The Comment about Other Robberies

Petitioner's final argument about the prosecutor is that he misled the jury when he implied that certain personal property, which was found in the pickup truck petitioner was driving on the day after the robbery, was circumstantial evidence of street robberies.  (Trial Tr. Vol. IV, 27, Sept. 20, 2004.)  Petitioner contends that there was no evidence to support this comment and it made him appear to be a bad person who had committed other robberies.

22

There was some support for the prosecutor's remark because jewelry and a woman's social security card were found in the truck that petitioner was driving on the day after the robbery. But even assuming that the remark was improper, the trial court charged the jury not to use evidence of another crime to conclude that petitioner was a bad person or likely to commit crimes and not to convict petitioner because they thought he was guilty of other bad conduct. (*Id*. at 60.) The trial court also instructed the jurors that the attorneys' arguments were not evidence and that the jurors should decide the case only on the evidence admitted during the trial. (*Id*. at 55-56.) The Court therefore concludes that, even if the prosecutor's remark was improper, the error was harmless.

To summarize, the prosecutor's remarks were either proper or harmless error. Further, the state court's conclusion that the prosecutor's conduct was proper advocacy was objectively reasonable. Petitioner therefore has no right to habeas relief on the basis of his claim of prosecutorial misconduct.

**E.  Appellate Counsel**
(Claim V of the supplemental petition)[3]

Petitioner alleges that his appellate counsel was ineffective for failing to raise petitioner's claims about trial counsel and the prosecutor on direct appeal. Additionally, petitioner alleges that appellate counsel should have "federalized" his claim about the pretrial identification of him. The state trial court rejected petitioner's claim about appellate counsel because it found no merit in petitioner's claim about the prosecutor and because petitioner's criticism of appellate counsel was not specific.

An appellate attorney's failure "to raise an issue on appeal can amount to

---

[3]  The fourth claim in the supplemental petition is erroneously labeled claim V, and the fifth claim is erroneously labeled claim VI.

constitutionally ineffective assistance." *Jalowiec v. Bradshaw*, 657 F.3d 293, 321 (6th Cir. 2011). However, an appellate attorney is not required to raise every non-frivolous claim requested by his client if counsel decides not to raise the claim as a matter of professional judgment. *See Jones v. Barnes*, 463 U.S. 745, 751 (1983). "In fact, the process of winnowing out weaker arguments on appeal is the hallmark of effective appellate advocacy." *Monzo v. Edwards*, 281 F.3d 568, 579 (6th Cir. 2002) (quotation marks and end citations omitted). To demonstrate that appellate counsel was ineffective, a habeas petitioner must show (1) that his attorney acted unreasonably in failing to discover and raise nonfrivolous issues on appeal and (2) there is a reasonable probability that he would have prevailed on appeal if his appellate attorney had raised the issues. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000).

For the reasons given above, petitioner's trial attorney was not constitutionally ineffective and the prosecutor's conduct was either proper or harmless error. Consequently, appellate counsel did not act unreasonably in failing to raise petitioner's claims about trial counsel and the prosecutor, and there is no substantial probability that petitioner would have prevailed on appeal if his attorney had raised the issues. Finally, because this Court found no merit in petitioner's constitutional claim about the pretrial identification, there is no substantial probability that petitioner would have prevailed on appeal if his attorney had "federalized" the claim.

The Court concludes that petitioner's appellate attorney was not constitutionally ineffective. "Appellate counsel cannot be found to be ineffective for 'failure to raise an issue that lacks merit.'" *Shaneburger v. Jones*, 615 F.3d 448, 452 (6th Cir. 2010) (quoting *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001)).

## IV. Conclusion and Order

The state courts' adjudications of petitioner's claims were not contrary to Supreme Court precedent, unreasonable applications of Supreme Court precedent, or unreasonable applications of the facts.  Nor were the state court decisions "so lacking in justification that there was an error . . . beyond any possibility for fairminded disagreement."  *Harrington*, 562 U.S. at 103. Accordingly,

IT IS ORDERED that petitioner's application for a writ of habeas corpus is denied.

IT IS FURTHER ORDERED that the Court declines to issue a certificate of appealability because reasonable jurists could not disagree with the Court's resolution of petitioner's constitutional claims, nor could they conclude that the issues deserve encouragement to proceed further.

IT IS FURTHER ORDERED that petitioner may not proceed *in forma pauperis* on appeal because an appeal in this matter could not be taken in good faith.  28 U.S.C. § 1915(a)(3).

S/ Bernard A. Friedman_____
Dated: June 22, 2015                           BERNARD A. FRIEDMAN
         Detroit, Michigan                         SENIOR UNITED STATES DISTRICT JUDGE

25